UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARLA M. KRESS

                Plaintiff,                CIVIL ACTION NO. 06-CV-12344-DT

       vs.                        DISTRICT JUDGE PAUL D. BORMAN

COMMISSIONER OF              MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

                Defendant.
_____/

REPORT AND RECOMMENDATION

I.    RECOMMENDATION

      This Court recommends that  Defendant's Motion for Summary Judgment be **DENIED** (Docket # 12), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 7), and that the case be **REMANDED** for further proceedings consistent with this Report.

II.    PROCEDURAL HISTORY

      This is an action for judicial review of the final decision by the Commissioner of Social Security that Plaintiff was not "disabled" for purposes of the Social Security Act.  42 U.S.C. §§ 423, 1382.  The issue for review is whether the Commissioner's decision is supported by substantial evidence.

      Plaintiff Carla Kress filed an application for Disability Insurance Benefits (DIB) with a protective filing date of December 6, 2002.  (Tr. 52-54, 57).  She alleged she had been disabled

since September 30, 1998 due to an obsessive compulsive disorder, anxiety, depression, and back and foot pain. (Tr. 60). Plaintiff's was insured for DIB through September 30, 2001. (Tr. 55, 57). Plaintiff's claims were initially denied in February 2003. (Tr. 41-46). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 47-48). A hearing took place before ALJ Alfred Vargas on August 9, 2004. (Tr. 183-220). Plaintiff had representation at the hearing. (Tr. 37, 40, 184). The ALJ denied Plaintiff's claims in an opinion issued on December 10, 2004. (Tr. 18-30). The Appeals Council denied review of the ALJ's decision on April 8, 2006 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 3-17). Plaintiff appealed the denial of her claims to this Court, and both parties have filed motions for summary judgment.

## III.   MEDICAL HISTORY

### A.   Medical Records Dated Pre-Alleged Onset Date

On January 3, 1989 Plaintiff was admitted to the University of Michigan Hospital, Department of Psychology, for depression and anxiety. (Tr. 146-55). Plaintiff reported that she had begun seeing a psychologist after she had graduated from high school. Plaintiff had gained a large amount of weight and had episodes of dizziness, "unreal" feelings, and panic attacks. (Tr. 147, 148). She saw the psychologist for about two years but then stopped because she did not feel that she was being helped. (Tr. 148). Thereafter, Plaintiff had seen a therapist off and on for 10 years. *Id.* Plaintiff began seeing another psychologist due to increased problems at her work as a receptionist. Her doctor had recommended the hospitalization. (Tr. 147-48).

Plaintiff also reported that she had been prescribed various medications over the years but that she discontinued them due to their alleged side effects. These medications included Haldol, Vivactil, Tofranil, Mellaril, Stelazine, Elavil, Limbitrol, and BuSpar. (Tr. 147). She also took Xanax, which only helped her sleep. *Id.*

Plaintiff stated that she felt very self-conscious and thought that others were always talking about her or laughing at her. (Tr. 147). She also had feelings of intense "unreality." When under pressure, Plaintiff said that she became very anxious and obsessive, making lists, constantly repeating in her head what she needed to do, and repeatedly engaging in various activities. (Tr. 148). Her speech was also halted and she had a hard time connecting her thoughts. *Id.* Plaintiff reported that she was constantly depressed and that she often overslept, especially if she was avoiding doing things she needed to do. *Id.*

A mental status examination was performed upon Plaintiff's admission to the hospital. (Tr. 149). Plaintiff was alert and oriented. Her affect was anxious and tremulous with frequent facial twitches and odd mannerisms. *Id.* Plaintiff could recall 3 out of 3 objects immediately and after 5 minutes if given cues. Plaintiff was also able to do serial 7s well, repeat 7 digits forward, spell "world" forward and backwards, recognize the similarities between objects, and understand the meaning behind proverbs. *Id.*

During the course of Plaintiff's hospital stay, it was observed that Plaintiff became less anxious and her affect was brighter after she was taken off of Xanax. (Tr. 150). Plaintiff also organized many social activities at the ward and participated in occupational therapy. *Id.*

Psychological testing showed that Plaintiff had deficits in her social skills and her social awareness. She especially had difficulty with the sequencing of social situations. Testing further revealed that Plaintiff had very high scores in avoidance, dependence, self-defeating personality patterns, and in the anxiety and dysthymic clinical syndrome. Plaintiff also exhibited social behavior that put others on edge. (Tr. 151).

In occupational therapy, Plaintiff decided that she wanted to move out of her mother's house but was unsure how to accomplish this goal. It was also observed during occupational therapy that Plaintiff had difficulty with completing and learning new tasks due to her perfectionistic characteristics. (Tr. 150-51).

Plaintiff was ultimately diagnosed with panic disorder and avoidant personality disorder with dependent features. (Tr. 146). She was discharged from the hospital on February 2, 1989. *Id.* Upon discharge, Plaintiff was placed on 40 mg of Prozac per day and was instructed to follow-up with her psychiatrist to receive future medication, to attend an assertiveness training group, and to pursue vocational rehabilitation and psychological counseling.

**B.    Medical Records Dated Post-Alleged Onset Date**

Medical records dated September 30, 1998 through September 30, 2001 show that Plaintiff was treated at an allergy clinic and was also treated by her family physician, Dr. Marc Adelman. (Tr. 113-27, 128-42). The treatment records indicate that these sources prescribed various medications to Plaintiff for her mental conditions. The medications included Prozac, Klonopin/Clonazepam, Zoloft, and Xanax. (Tr. 115, 11, 119, 121, 124, 135, 140).

-4-

C.    <u>Medical Records Dated Post-DIB Insured Status Expiration</u>

In January 2003 Dr. Edward Nol, a board certified psychiatrist, completed a psychiatric medical report regarding Plaintiff. (Tr. 89-94). Dr. Nol indicated that Plaintiff was being seen on a bi-weekly basis as an out-patient. He first saw Plaintiff in March 2000 and last saw her in December 2002. (Tr. 94). Plaintiff's medications at the time consisted of Celexa and Xanax. (Tr. 89). He noted that Plaintiff attended her appointments well but resisted compliance with her medication due to reported side-effects. *Id*.

Dr. Nol reported that Plaintiff's contact with other individuals, especially those in trade, was marked by a paranoid conviction that she would be treated unfairly. Consequently Plaintiff had daily conflicts in stores, hair salons, and other service establishments. She was also compulsive, which resulted in her being victimized. (Tr. 90). Dr. Nol further noted that Plaintiff engaged in much on-line shopping but had returned so many items that she was enjoined from further ordering by some companies. She would also make service appointments but arrive extremely late, which would annoy personnel. At stores, Plaintiff would complain about merchandise often enough that she was recognized by staff and perceived as annoying. (Tr. 91).

Dr. Nol wrote that up until early 2001 Plaintiff was routinely late for her therapy appointments but that she was recently arriving on time for her appointments on a consistent basis. (Tr. 91). Plaintiff was well-dressed and groomed for her appointments and had a pleasant and cooperative attitude. However, Dr. Nol noted that it was difficult to induce Plaintiff into

-5-

a discussion of relevant material. *Id.* The stream of Plaintiff's mental activity was within normal limits and she was fully oriented and in contact with reality. (Tr. 92). There was also no evidence that Plaintiff had a thought disorder but she complained of "feeling unreal." *Id.* Plaintiff was also of at least average, if not above average, intelligence. (Tr. 93). Dr. Nol also commented that Plaintiff's mood and affect were generally euthymic. *Id.* Plaintiff developed a dependency upon her therapist and saw him as the only person who took her seriously. *Id.* Dr. Nol indicated that he diagnosed Plaintiff with generalized anxiety disorder, obsessive-compulsive disorder, dysthymic disorder, and dependent personality disorder. (Tr. 94). He noted that Plaintiff's current Global Assessment of Functioning ("GAF") score was 45 and that the highest it had been in the previous year was 40.[1]

In February 2003 Dr. Syndey Joseph reviewed Plaintiff's medical records at the state's request and completed a Psychiatric Review Technique ("PRT") form. Dr. Joseph concluded that Plaintiff had an affective disorder (dysthmic disorder), an anxiety-related disorder (generalized anxiety and obsessive-compulsive disorder), and a personality disorder (pathological

---

[1]        "The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* ("DSMV-IV") (Text Revision 4th ed. 2000) at 32. A GAF of 31-40 is extremely low, and "indicates [s]ome impairment in reality testing or communication ... [or] major impairment in reality testing or communication ... [or] major impairment in reality testing or communication ... [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* at 34. A GAF of 45 indicates "[s]erious symptoms ... [or] any serious impairment in social, occupational, or school functioning." *Id.*

-6-

dependence, passivity, or aggressivity).  (Tr. 99, 102, 104, 106).  He further noted that Plaintiff's mental impairments resulted in mild restrictions of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation for an extended duration.  (Tr. 109).

Dr. Joseph also completed a Mental Residual Functional Capacity ("RFC") Assessment form.  (Tr. 95-98).  Dr. Joseph concluded that Plaintiff was moderately limited in her ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) interact appropriately with the general public; (4) respond appropriately to changes in the work setting; and (5) set realistic goals or make plans independently of others.  Dr. Joseph concluded that Plaintiff was capable of a wide range of unskilled tasks in a regular work environment.  (Tr. 97).

In October 2003 Dr. Nol wrote a letter to Plaintiff's counsel summarizing Plaintiff's mental health condition and treatment.  (Tr. 143).  Dr. Nol noted that he had treated Plaintiff regularly for the past two years, usually seeing her once or twice a month.  *Id.*  Dr. Nol described Plaintiff's condition as having two main elements: (1) obsessive-compulsive disorder; and (2) crippling anger.  Dr. Nol noted that Plaintiff was self-defeating to a pathological degree and that Plaintiff had obsessions with getting what she felt she was entitled to, anger at not succeeding, and resulting depression and panic.  *Id.*  Dr. Nol commented further that the effectiveness of Plaintiff's medication was hampered by the "side effect profiles", which left a "long and tedious therapeutic program" as the only treatment alternative.  *Id.*

-7-

Dr. Nol elaborated upon Plaintiff's condition in another letter written to Plaintiff's counsel in November 2003. Dr. Nol noted that he had initially seen Plaintiff on two occasions in Spring 2000 at which time he diagnosed Plaintiff with generalized anxiety disorder characterized by panic attacks. (Tr. 157). The severity of Plaintiff's condition had fluctuated over the past two years but the diagnosis remained the same. He noted that Plaintiff experienced debilitating anxiety and panic with long periods of an inability to function and with paralyzing depression. Dr. Nol further reported that Plaintiff's condition was "stubborn", requiring long-term treatment and constant alertness to self-defeating behavior. Dr. Nol noted in conclusion that "[g]iven the history prior to her being seen in 2000 [*sic*] it appears that [Plaintiff] had been disabled by this condition for at least a year at that time." *Id.*

The record also contains reports from First Resources North Treatment Center, which document Plaintiff's mental health treatment in 2004. Dr. Xavier Burgoyne, a psychiatrist, performed a mental status examination of Plaintiff in January 2004. (Tr. 165-66). He noted that Plaintiff tended to be over-inclusive in her conversation but her speech was grossly organized, goal-directed, and responsive to questioning. (Tr. 166). Plaintiff's hygiene and grooming were presentable. Dr. Burgoyne reported that Plaintiff displayed no clear psychotic or significant mood symptoms or signs during the interview. Her affect and mood were within range. Plaintiff demonstrated no lapses or deficits of memory. Her concentration appeared adequate with no evident deficits. Dr. Burgoyne further stated that Plaintiff was very capable of abstract

thinking but she had impaired judgment and limited insight in terms of medication non-compliance. *Id.*

Dr. Burgoyne diagnosed Plaintiff with: (1) generalized anxiety-disorder, rule out panic disorder without agoraphobia; and (2) personality disorder, not otherwise specified, with hysterical features. (Tr. 166). He assigned Plaintiff a GAF score of 55.[2] Dr. Burgoyne discontinued Plaintiff's Xanax and replaced it with Klonopin. He advised Plaintiff to carry a paper bag with her in case of hyper-ventilation, which Plaintiff reported was a symptom of her panic attack. A follow-up appointment was scheduled for 4 to 6 weeks later. *Id.* The record also contains progress notes from Plaintiff's therapy sessions with Darren O'Brien, M.A. through First Resources North Treatment Center, which occurred about twice a month. (Tr. 174-82).

## IV.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff was 45 years old at the time of the hearing. (Tr. 187). She had a high school education. *Id.* Plaintiff testified that she stopped working in 1998 because she felt overwhelmed and was given more responsibility than she could handle. *Id.* She was also having difficulties with anxiety and depression at the time. (Tr. 188). Plaintiff told the ALJ that she was treated by her psychiatrist, Dr. Nol, and that Dr. Nol had prescribed her

---

[2]    A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSMV-IV at 34.

medication for her mental condition. *Id.* According to Plaintiff, the medication made her feel "unreal" with anxiety, panic attacks, and depression. *Id.* These feelings were quite constant and occurred daily. (Tr. 189). Plaintiff stated that every other day she experienced depression that made her sick and hurt all over such that she needed to lie down. (Tr. 191). Sometimes she lay down 3 to 4 times per day. *Id.* Plaintiff's depression also made her cry on occasion and her crying spells were often triggered when she remembered traumatic experiences. *Id.* Plaintiff's symptoms also affected her ability to maintain attention and concentration and to do tasks. *Id.* Plaintiff further informed the ALJ that she had difficulty doing laundry and household chores. (Tr. 192-93). Plaintiff testified that on some days she would become irritable or edgy and have arguments with her mother. (Tr. 189). To cope with her stress, Plaintiff would sometimes leave the house to go on an errand or to an appointment although this did not always work to relieve her symptoms. (Tr. 192). Plaintiff also testified that she would write herself notes, which were all over her house, because she had problems remembering things. Plaintiff stated that she was able to keep her appointments but that she would become anxious and panicky when thinking about deadlines or appointments. (Tr. 193-94). Plaintiff further testified that her condition would constantly fluctuate. (Tr. 195-96). Plaintiff's medication helped somewhat but did not completely relieve her symptoms. (Tr. 188). Plaintiff regularly took her medication at set intervals throughout the day although sometimes she would increase her anti-anxiety

-10-

medication if her symptoms were worse.  (Tr. 189-90).  Although the extra medication

helped to a certain degree, Plaintiff still experienced symptoms.  (Tr. 190).

      B.      **<u>Vocational Expert's Testimony</u>**

      Raymond Dulecki, a rehabilitation counselor, testified as a vocational expert at the

hearing.  (Tr. 198-206).  Mr. Dulecki testified that if Plaintiff's testimony regarding the

severity of her symptoms were fully credited then Plaintiff would not be able to perform any

work.  (Tr. 200-01).  The ALJ asked Mr. Dulecki to testify as to what jobs would be available

to an individual of Plaintiff's age, sex, education, and work experience who could not

perform work at unprotected heights, climb, recline, or work with dangerous or hazardous

machinery.  The work would also have to be very simple and routine in nature, require no

more than a few steps to complete assigned tasks, be low in stress, and required very limited

contact, if any, with the public, co-workers, and/or supervisors.  Mr. Dulecki testified that in

southeast Michigan there would be unskilled, light level jobs that the individual could

perform including 6,000 janitorial jobs and 9,000 stock and material handling jobs.  (Tr. 202).

      Mr. Dulecki also testified that the janitorial jobs were night shift positions at which

generally other people were not present.  Typically, however, a supervisor and 2 or 3 other

members of the janitorial crew would be present.  (Tr. 202, 204).  He further testified that as

to the material and stock handler jobs, there would also be some contact with supervisors

and typically an employee could not be off task for more than 5 to 10 minutes, not including

normal breaks.  (Tr. 203-04).

C.    Dr. Nol's Testimony

Dr. Edward Nol, Plaintiff's treating psychiatrist, also testified at the hearing. (Tr. 206-220). Dr. Nol testified that he first saw Plaintiff in March 2000 for an initial consultation. Plaintiff had been in treatment with a social worker for 1 or 2 years who referred Plaintiff to Dr. Nol for medication review. (Tr. 208). When Dr. Nol met Plaintiff, she displayed symptoms consistent with borderline personality disorder and with being obsessive-compulsive. (Tr. 207-08, 209). Dr. Nol believed that at the time Plaintiff had fairly recently been fired from her last job. Plaintiff did not have an intimate partner and wondered if she would ever be able to have such a relationship. (Tr. 208). Dr. Nol also indicated that, as was typical for individuals with borderline personality disorder, Plaintiff was "pretty" intelligent and could verbally express herself well. However, Plaintiff had a tendency to be less than forthright. *Id.* Plaintiff also complained of problems in her relationship with her mother, her one and only friend, and her sister. (Tr. 209). She also reported that she had feelings of being overwhelmed and of being involved in stressful social situations. *Id.* Plaintiff's obsessive-compulsive traits included over-eating and "going back to ask for more punishment" such as returning to a store at which she felt she had been treated unfairly. (Tr. 210).

Plaintiff's attorney asked Dr. Nol whether he was familiar with the listing of impairments used by the Social Security Administration. (Tr. 201). Dr. Nol testified that Plaintiff's condition would undoubtedly affect her ability to concentrate, maintain attention,

and be persistent at a task. *Id.* When Plaintiff's counsel asked Dr. Nol to rate the severity of

her limitation in this area, Dr. Nol remarked that he was not familiar with the rating scale.

(Tr. 210). Plaintiff's counsel then asked Dr. Nol whether Plaintiff's impaired concentration

and attention occurred on a frequent, constant, or seldom basis. (Tr. 211). Dr. Nol

responded that it was "intermittent" but "mostly frequent". *Id.* Dr. Nol further testified that

Plaintiff's ability to socialize and to get along with the public was also impacted on a daily

basis. *Id.* Further, Plaintiff's ability to perform daily activities was impacted because she

would not perform her household duties when she felt that she was entitled to more

consideration. *Id.* Dr. Nol concluded that Plaintiff's ability to perform work in a normal

work setting, 8 hours a day, 5 days a week, would have been compromised because Plaintiff

was consistently late and was extremely self-defeating. (Tr. 211-12). He further noted that

these were reasons why Plaintiff had been fired from two of her jobs in the past. *Id.* Dr.

Nol also testified that he did not think that any job would be appropriate for Plaintiff in her

present condition. (Tr. 212).

The ALJ then asked Dr. Nol some questions regarding his January 2003 report in

which he indicated that Plaintiff had been disabled since 1999. Dr. Nol testified that by the

term "disabled", he meant "an inability . . . to perform in activities of daily living as they

relate to employment . . . to relationship . . . and in general . . . [to] reality orientation." (Tr.

213). Dr. Nol told the ALJ that much of his opinion was based upon independent

recollection although he did have notes. He also stated that his opinion was based in part

-13-

upon information provided to him by Plaintiff, including a history of her treatment as a

teenager, her 1989 hospitalization, her past medication, and her employment history. (Tr.

214-15). Dr. Nol further opined that Plaintiff had experienced these problems since she was

a teenager although he did not think her condition had changed in 1998 when Plaintiff

stopped working or in 2000 when he had examined Plaintiff. (Tr. 213).

Dr. Nol further testified that he prescribed medication to treat Plaintiff's condition at

the March 2000 consultation, including an anti-obsessive/compulsive medication and anti-

anxiety medications. The medication would alleviate Plaintiff's symptoms for a few weeks

or months but then she would complain of side effects such as sleeplessness and jitteriness

and would subsequently stop taking her medication. (Tr. 208, 216).

After the initial consultation in March 2000, Dr. Nol did not see Plaintiff again until

January 2002. (Tr. 206, 208, 215). During the interim, Dr. Nol believed Plaintiff was seeing

a social worker about twice a week. (Tr. 216). Dr. Nol did not know whether Plaintiff was

taking her medication at this time. *Id.*

Dr. Nol was also asked about GAF scoring. (Tr. 216-19). Dr. Nol testified that he did

not assign Plaintiff a formal GAF score when he saw her in March 2000 but he estimated that

it was at the level of 40. He also noted that Plaintiff's GAF score in January 2002 was a 40

and that Plaintiff's highest GAF score in January 2003 was a 45, referring to his January 2003

report. (Tr. 217-18). Dr. Nol stated that he always determined patients' GAF scores but that

he did not formally record them unless there was an official request for one. (Tr. 218). The

-14-

GAF score he assigned to Plaintiff in his January 2003 report was for the purposes of Plaintiff's pending social security case.[3] (Tr. 219).

## V.    LAW AND ANALYSIS

### A.    STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). It is not the function of this court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the

---

[3]    The ALJ noted at the end of the hearing that he would leave the record open so that Plaintiff could submit notes from the social worker who had treated Plaintiff after March 2000. (Tr. 219). No such records were submitted.

-15-

Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently. *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B.   FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

(1)   he was not presently engaged in substantial gainful employment; and

(2)   he suffered from a severe impairment; and

(3)   the impairment met or was medically equal to a "listed impairment;" or

(4)   he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled.  20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in

-16-

response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

C.     **ANALYSIS**

    1.     **Dr. Nol's Opinions**

Plaintiff contends that the ALJ erred by rejecting the opinions of her treating psychiatrist, Dr. Nol, in violation of 20 C.F.R. § 404.1527(d)(2).  As the Sixth Circuit stated in *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997), "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once."  Indeed, 20 C.F.R. § 404.1527(d)(2) provides that a treating source's opinion regarding the nature and severity of a claimant's condition is entitled to controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. However, an ALJ is not bound by a treating physician's opinion if that opinion is not supported by sufficient clinical findings or is otherwise inconsistent with other substantial evidence in the record. *See Walters*, 127 F.3d at 530.  But, if an ALJ rejects a treating physician's opinion on the issues of the nature and severity of a claimant's impairments, he must "give good reasons" for doing so in his written opinion." 20 C.F.R. § 404.1527(d)(2); see also Social Security Ruling ("SSR") 96-5p.

The ALJ need not, however, "give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ." 20 C.F.R. § 404.1527(e)(3).  One such issue is "the

determination or decision about whether you meet the statutory definition of disability." 20 C.F.R. § 404.1527(e)(1).

The Court preliminarily notes that the ALJ did not reject Dr. Nol's opinions outright. Rather, the ALJ noted that he considered Dr. Nol's opinions but did not give them great weight. (Tr. 27). Moreover, no error occurred as a result of the ALJ's decision not to defer to Dr. Nol's ultimate conclusion that Plaintiff was disabled because she was unable to perform any type of job as a result of her mental impairments. Such an opinion did not concern the nature or severity of Plaintiff's impairments. Rather, it was an opinion on an issue reserved to the Commissioner and was entitled to no "special significance." (Tr. 27).

Plaintiff nevertheless contends that the ALJ erred by not crediting Dr. Nol's testimony that did relate to Plaintiff's specific limitations. Specifically, Plaintiff argues that the ALJ should have deferred to Dr. Nol's opinion that Plaintiff met the listing requirements for mental impairments, which necessitated a finding of disability. Plaintiff bases her argument on Dr. Nol's testimony that Plaintiff's concentration and attention were impaired on a "mostly frequent" basis and that Plaintiff's ability to socialize, get along with the public, and perform daily activities was also impacted by her mental impairments. (Tr. 211).

The Commissioner has prescribed rules for evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. The Commissioner first determines whether there is a medically determinable mental disorder specified in one of nine diagnostic categories. *See Ibid.*; 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.00A. The clinical findings are referred to as the "A" criteria. Thereafter, the

-18-

Commissioner measures the severity of a mental disorder in terms of functional restrictions, known as the "B" criteria, by determining the frequency and intensity of the deficits.

According to 20 C.F.R. § 404.1520a(c)(3), the "B" criteria require an evaluation in four areas with a relative rating for each area. Thus, the Commissioner must evaluate deficits in activities of daily living, social functioning, and persistence, concentration, or pace and rate those on a five-point scale ranging between none, mild, moderate, marked, and extreme. The fourth area of deterioration or decompensation in work or work-like settings calls for a rating of never, one or two, three, and four or more. 20 C.F.R. § 404.1520a(c).

Anxiety-related disorders, personality disorders, and affective disorders are listed impairments under the regulations. 20 C.F.R. Pt. 404. Subpt. P, App. 1 §§ 12.04, 12.06, 12.08. For any of these impairments to be functionally equal in severity, a claimant must establish two of the following: (1) "marked" limitations in restriction of activities of daily living; (2) "marked" difficulty in maintaining social functioning; (3) "marked" difficulty in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.[4]

_____

[4]       An anxiety-related disorder will also be found disabling if the claimant meets the "A" and "C" criteria for the listing. 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.06. An affective disorder can be disabling if only the "C" criteria is met. *Id.* at § 12.04. Moreover, if the claimant proves that his or her mental impairment has caused an extreme limitation in his or her ability to engage in activities of daily living, to maintain social functioning, or to maintain concentration, persistence, or pace, or, if the claimant has had four or more episodes of decompensation, then the claimant shall be found disabled. 20 C.F.R. § 404.1520a(c) ("The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.")

In applying the factors, the ALJ determined at step two that Plaintiff had an obsessive compulsive disorder, generalized anxiety, dysthymic disorder, and panic attacks ("A" criteria). (Tr. 24.). The ALJ further concluded that Plaintiff's impairments as found in step two caused her to have: (1) moderate restrictions in her activities of daily living; (2) moderate restrictions in maintaining social functioning; (3) moderate restrictions in maintaining concentration, persistence, or pace; and (4) no repeated episodes of decompensation lasting for extended periods ("B" criteria). (Tr. 24-25). Based upon these findings, the ALJ concluded at step three that Plaintiff's mental impairment did not meet or medically equal any listed impairment. (Tr. 24).

In making this decision, the ALJ properly recognized that Dr. Nol's testimony did not establish that Plaintiff's mental impairment was equal in severity to any listed impairment. Plaintiff equates Dr. Nol's opinion regarding Plaintiff's frequent difficulties with maintaining concentration, persistence, or pace with an opinion that the severity of Plaintiff's impairment in this area was "marked." Under the old regulations, the frequency with which a claimant suffered limitations in concentration, persistence, or pace as a result of his or her mental impairments was rated on a scale of never, seldom, often, frequent, and constant. The regulations were amended in 2001 to reflect the rating scale noted above. *See e.g.* 20 C.F.R. § 1520a; *Bolden v. Comm'r of Soc. Sec.*, 2005 WL 1871121 *7 (E.D. Mich. 2005). Plaintiff assumes that "frequent" is the functional equivalent of "marked" presumably because both terms fall on

_____

Plaintiff has not alleged that her mental impairments have caused any limitations that would meet this additional criteria. Therefore, the Court will not consider this criteria any further in its Report and Recommendation.

-20-

the same point on their respective linear scales.  However, Plaintiff provides no legal authority to support this assumption and the Court is not inclined to create such authority for her.

Moreover, as Defendant notes, Dr. Nol testified that he was unfamiliar with the rating scale used to determine the severity of a claimant's impairments.  This alone was a reasonable basis for the ALJ to question the credibility of Dr. Nol's testimony.  Plaintiff's counsel informed Dr. Nol that Plaintiff's limitations should be rated as either frequent, constant, or seldom.  Not only was the rating scale set forth by Plaintiff's counsel out-dated, it was incomplete because it omitted the limitations of "never" but more importantly "often".  Consequently, the competency of Dr. Nol's testimony  as to the severity of Plaintiff's limitations was therefore suspect as it was based upon incomplete and inaccurate information.

Even if Dr. Nol's opinion that Plaintiff's frequent limitations in concentration, persistence, or pace did functionally equate with an opinion that her limitations were "marked", there is no basis in Dr. Nol's testimony regarding Plaintiff's daily activities and social functioning for finding that Plaintiff suffered "marked" limitations in at least one of those other two areas, which Plaintiff was required to prove.  Therefore, the ALJ properly determined that Dr. Nol's testimony did not amount to an opinion that Plaintiff's mental impairments were equal in severity to any listed impairment.

The ALJ also cited to several reasons for not crediting Dr. Nol's assessment of the severity of Plaintiff's level of functioning as denoted by his GAF score of 40 and for generally giving Dr. Nol's opinions limited weight.  The ALJ noted that Dr. Nol's treatment relationship with

-21-

Plaintiff during the relevant time period was limited to one evaluation in March 2000. Indeed, Dr. Nol testified that he had no idea whether Plaintiff was compliant with her medication during the relevant time period. Given this information, the ALJ reasonably concluded that the lack of a treatment relationship during the time at issue weighed against the strength of Dr. Nol's opinions. Furthermore, Dr. Nol did not formally assign Plaintiff a GAF score in March 2000. As the ALJ noted, it was not until the hearing four years later that Dr. Nol estimated that Plaintiff's GAF score at the time was 40. Therefore, the reliability of Dr. Nol's assessment of the severity of Plaintiff's condition within the relevant time period was undermined. The reliability of Dr. Nol's opinions was further compromised by the lack of any relevant mental health treatment notes. The only records pertaining to this time frame were from Plaintiff's allergy clinic and Dr. Adleman, which indicated that Plaintiff was regularly attending appointments and receiving medications.

Additionally, Dr. Nol also testified that his opinions regarding Plaintiff's impairments were based in large part upon Plaintiff's subjective statements which, as Defendant notes, provides an ALJ with a reasonable basis for discounting a treating physician's opinion. *See McCoy ex rel. McCoy v. Chater*, 81 F.3d 44, 47 (6th Cir. 1995). Moreover, Dr. Nol stated that Plaintiff's condition had remained unchanged since her teenage years. However, as the ALJ noted at the hearing, Plaintiff had been able to maintain employment since she was a teenager despite the mental impairments that Dr. Nol alleged were so severe. Given the record as a

-22-

whole, the Court concludes that substantial evidence supports the ALJ's decision to afford Dr. Nol's opinions little weight.[5]

2.    <u>Plaintiff's Credibility</u>

In assessing Plaintiff's credibility, the ALJ made the following finding: "[t]he undersigned finds that claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision." (Tr. 29). Plaintiff claims, albeit briefly, that the ALJ erred in reaching this conclusion.

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Further, "[d]iscounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.* With regard to a claimant's assertions of disabling pain, the Sixth Circuit has established the following two-step test:

> First we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain rising from the condition; or (2) whether the

---

[5]    Defendant also seeks to support the ALJ's decision by referencing the opinions of the state agency psychologist and information contains in the records from 2004. However, the ALJ did not discuss the state psychologist's opinion but only noted that Plaintiff's counsel had objected to it. The ALJ clearly did not rely upon this evidence or resolve the objection to its admission into evidence. The ALJ also did not discuss or rely upon any of the 2004 evidence.

-23-

>objectively established medical condition is of such severity that it
>can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531.

In addition to the available objective medical evidence, the ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain.  See 20 C.F.R. § 404.1529(c)(3); see also *Felisky v. Bowen*, 35 F .3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

SSR 96-7p requires an ALJ to give careful consideration to a claimant's allegations of pain and other symptoms and to set forth specific reasons, supported by reference to evidence in the record, for the credibility determination made:

>This documentation is necessary in order to give
>the individual a full and fair review of his or her claim, and in order
>to ensure a well reasoned determination or decision.

SSR 96-7p, 1996 WL 374186 at * 4.

The ALJ directed the reader to the body of his opinion for the basis of his credibility determination.   In his opinion, the ALJ acknowledged that he was required to consider Plaintiff's subjective complaints and cited to the standard for making this determination.  (Tr. 25).  The ALJ then discussed Plaintiff's testimony regarding the limitations she claimed to suffer

-24-

as a result of his mental impairments noting some consistencies and inconsistencies between Plaintiff's testimony and that of Dr. Nol. (Tr. 25-27). Ultimately, however, the ALJ never reached any conclusions regarding the credibility of Plaintiff's statements. Indeed, there is no reference in the body of the opinion to "credibility." The ALJ did not state which aspects of Plaintiff's testimony he found to be credible or incredible based upon the factors set forth in 20 C.F.R. § 404.1529 and he did not support his determination by reference to evidence contained in the record. In other words, there is no logical bridge between the ALJ's rendition of the facts and his ultimate conclusions such that this Court can engage in meaningful review. *See, e.g., Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Moreover, the credibility of Plaintiff's statements has significant ramifications. A claimant's subjective statements should be considered by an ALJ at step three when assessing the functional limitations imposed by the claimant's mental impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(1)(b). Furthermore, the VE testified that if Plaintiff's complaints were credited, then all work would be precluded. (Tr. 200-01). Based upon the foregoing, the Court concludes that substantial evidence does not support the ALJ's credibility assessment. Therefore, the case must be remanded so that the ALJ may conduct a re-assessment of Plaintiff's credibility, specifically citing to the facts that support his or her determination. Thereafter, the ALJ should: (1) specifically state whether Plaintiff's credible complaints affect his or her step three finding

and RFC finding and the reasons for those decisions; and (2) conduct a new step five analysis if otherwise appropriate.[6]

## VI.    RECOMMENDATION

The Commissioner's decision is not supported by substantial evidence.  Defendant's Motion for Summary Judgment (Docket # 12) should be **DENIED**.  Plaintiff's Motion for Summary Judgment (Docket # 7) should be **DENIED**.  The case should be **REMANDED** back to the Commissioner for further proceedings consistent with this Report.

## VII.    NOTICE TO THE PARTIES

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary*,

---

[6]    Plaintiff also faulted the ALJ for not addressing the statements of Plaintiff's mother.  (Tr. 78-82).  SSR 83-15, 1983 WL 31245 * 2 provides that "information concerning activities given by the individual, particularly during a consultative examination, may be scant or generalized and may be in conflict with the clinical picture observed . . ..  It is necessary to resolve any inconsistencies and to obtain a proper understanding of the individual's activities.  Third party non-medical information may be useful . . . One should consider information provided by others, including family members . . ..  Upon the remand, the ALJ should consider the statements of Plaintiff's mother and indicate what weight, if any, is given to them and the basis for that decision.

931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 22, 2007                    s/ Mona K. Majzoub
                                         MONA K. MAJZOUB
                                         UNITED STATES MAGISTRATE JUDGE


## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: March 22, 2007                    s/ Lisa C. Bartlett
                                         Courtroom Deputy

-27-